**NOT FOR PUBLICATION**                                          [Docket No. 7]

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

_____
                                            :
JOSEPH NATHAN SINGLETARY, III,              :
                                            :     Civil Action No.
          Plaintiff,                        :     11-0392 (RMB)
                                            :
     v.                                     :     **MEMORANDUM OPINION**
                                            :
BURLINGTON COUNTY JAIL et al.,              :
                                            :
          Defendants.                       :
_____:

**Bumb**, District Judge:

    This matter comes before the Court upon Plaintiff's filing of his amended complaint.

    On July 1, 2011, the Clerk received Plaintiff's original complaint, see Docket Entry No. 1, his application to prosecute this matter in forma pauperis, see Docket Entry No. 1-2, and his motion for appointment of pro bono counsel.

    On July 14, 2011, this Court issued an order and accompanying opinion ("July Opinion") granting Plaintiff in forma pauperis status, dismissing some of Plaintiff's challenges with prejudice and some without prejudice, and denying his application for pro bono counsel without prejudice, as premature. See Docket Entries Nos. 4 and 5.

    In its July Opinion, the Court explained to Plaintiff, in

great detail, the pleading requirement as well as the relevant substantive tests. Specifically:

    a.    The Court explained to Plaintiff that challenges based solely on the doctrine of <u>respondeat superior</u> were not cognizable for the purposes of a Section 1983 action and, therefore, Plaintiff's claims against the warden, based solely on Plaintiff's assertion that the warden was "in charge" of the Burlington County Jail, were subject to dismissal;

    b.    The Court also pointed out that Burlington County Jail and its Medical Department were not entities cognizable as "persons" for the purposes of a Section 1983 action, <u>see id.</u> at 8 (citing <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 68-70 (1989), and <u>Grabow v. Southern State Correctional Facility</u>, 726 F. Supp. 537, 538-39 (D.N.J. 1989); and

    c.    In addition, the Court detailed, at great length, the legal standard governing Eighth Amendment challenges.

The Court noted in its July Opinion:

> [B]eing mindful of Plaintiff's <u>pro se</u> status and recognizing that Plaintiff might have inadvertently omitted to state the facts indicative of a plausible Eighth Amendment claim, the Court will dismiss Plaintiff's Complaint without prejudice, and will allow Plaintiff to file an amended pleading elaborating on Plaintiff's claims and specifying the dates of the relevant events.

<u>Id.</u> at 15-16 (footnote omitted).

Consequently, the Court dismissed Plaintiff's claims amenable t o cure by repleading without prejudice.

In response, Plaintiff submitted his amended complaint at bar. <u>See</u> Docket Entry No. 6. The allegations stated in that amended complaint are detailed on day-by-day – and, on occasion, even on hour-by-hour – bases and state, in relevant part, as follows:

> Plaintiff was in Bur1ngton County Jail for a parole violation. [During his stay there,] he was involved in an physical alteration [with another inmate] on 10—12—10. [That other inmate, apparently, suffered such injuries that he had to be taken to the Jail's Medical Department immediately. In contrast, Plaintiff's participation in that altercation] resulted in his finger being injured . . . . Plaintiff was escorted to [a solitary confinement cell] by Sgt. Nunn and Sgt. Eddy. [After his arrival to that cell, Plaintiff went to the Medical Department in order to receive his regular medications; he obtained these medications from] a Nurse named Roxxana [and complained to Nurse Roxxana about his injured finger; in response, Nurse Roxxana guessed that the finger] was probably broken [and recommended Plaintiff to execute a "medical slip," <u>i.e.</u>, a request for medical attention with regard to his injured finger]. So Plaintiff dropped a medical slip . . . . [On the same date, that is, on the date of his altercation, his injury, his conversation with Nurse Roxxana and his execution of a "medical slip,"] Plaintiff [also] spoke with Nurse Adrianna and Nurse Susan and [apparently, gave them additional copies of the "medical slip" which he executed upon recommendation of Nurse Roxxana. In addition, still on the same date, that is, on] 10—12—10 Plaintiff [also] gave Sgt. Zoll [another copy of the same "medical slip." Then, on an unspecified date, which might have been still October 12, 2010, or a later date,] Plaintiff spoke with Lt. Laaf [about his request to be seen by a medical personnel about his finger] as well as [with] Captain Lorkin . . . . [In addition, on unspecified date, which might have been still October 12, 2010,

or a later date,] Plaintiff went to [the Medical Department to obtain medical care] regarding his breathing and showed Nurse Maurice his finger. Nurse Maurice stated [that the swelling of the finger] will go away . . . [and when] Plaintiff asked to see [a] doctor, Nurse Maurice [insisted on his diagnose that the swelling of the finger] will go down [on its own. Four weeks after the date of the altercation and Plaintiff's alleged injury, that is,] on 11-9-10[,] Plaintiff gave another medical slip to Nurse Roxxana [that development occurred] at 5:00 a.m. [on November 9, 2010, when Plaintiff went to the Medical Department for some] medication[. Apparently, on that very day, he also encountered] Nurse Tom [whom Plaintiff asked whether] he was scheduled [to see a] doctor [with regard to his finger, and Nurse Tom replied] no. Plaintiff [then] asked [Nurse Tom] why [he was not scheduled to see a doctor, to which Nurse Tom replied that Plaintiff had to put a "medical slip" and, had he done so, he] would [have] been scheduled. Plaintiff [then] asked Officer . . . Henry if he could put in another medical slip [and Officer] Henry stated yes. . . . Plaintiff then gave [that new] medical slip to Sgt. Thompson. [Plaintiff was seen by medical personnel on that very day, that is, November 9, 2010. During that examination, a] doctor stated that Plaintiff took to[o] long to be seen. [The doctor guessed] that the finger was probably shattered [but did not take an x-ray immediately. Therefore, on the same date,] Plaintiff filed a grievance. . . . [In addition, next day, that is, on November 10, 20109,] Plaintiff also put in another medical slip regarding pain in his finger. [Moreover, on the following day, that is,] on 11-11-10, Plaintiff [submitted yet another] medical slip stating his finger was in a lot of pain, and [that he] would like an x-ray or [to] see a specialist. [Also, on that same date, that is, on November 11, 2010,] Plaintiff . . . gave Sgt. Zoll two [more copies of his] medical slip, to ensure they were received by [the M]edical [D]epartment. On the next day, that is,] on 11-12-10[,] Plaintiff was escorted to [the Medical Department] and was told by [a] doctor that an x-ray would be ordered, the doctor also [recommended Plaintiff] not to work out [his] hand. . . . [Later on, on the same day, that is,] on

11–12–10[, an] x-ray was taken [and Plaintiff] was told [he] would have results by [the] end of [the] day. [Next day, that is,] on 11–13–10[,] Plaintiff asked Nurse Adrianna about [the results of his] x-ray, [and] Nurse [Adrianna opined] that, if Plaintiff didn't get response [then it must have meant that his] hand was fine. Plaintiff [however] put in another medical slip [on the very same date, that is, on November 13, 2010,] asking to see a specialist or to have an MRI taken. [In addition, on that same date, he] spoke to Nurse Nicole regarding the results of his] x—ray, [in response to his request,] Nurse [Nicole] checked [his] file [and found] no results. [Therefore, next day, that is,] on 11–14–10[,] Plaintiff gave [yet another "medical slip" to a certain] Mrs. Jones . . . [Apparently, the results of Plaintiff's x-ray were received by November 15, 2010, since already] on 11–15–10[,] Plaintiff spoke to Nurse Stacy and she stated [results of the] x-ray [were received and] showed non displaced fracture.[1] Since finger [was] still swollen [Plaintiff was informed that he would] be sent out to see specialist, [and a request for] appointment [was made the next day, that is,] on 11–16–11 . . . . [Two days later, that is,] on 11–18–10, Plaintiff [was seen by] Doctor Planch Bong [who] stated [that Plaintiff's] "Non Displaced Fracture" x-ray show[ed] no nerve damage . . . . [Next day, that is,] on 11-19-10, Plaintiff [was sent to be seen by another doctor at the] Hand Surgery and Rehabilitation Center . . . . [Specifically,] Plaintiff was seen by Andrew B. Sattel, M.D. who stated that if Plaintiff was brought in sooner he would [have] been able to have [Plaintiff's] finger . . . taken care of [in a better fashion. Dr. Sattel verified that Plaintiff's] finger [was] healing on its own. . . . He also stated [that,] because of the time elapsed since the injury, the finger [which is, seemingly, Plaintiff's small finger, i.e., digitus minimus, commonly known as "pinky," could] be permanently

---

[1] "When a break is non-displaced, that means the bone is broken but still remains in place." <<http://www.healthandnutritiontips.net/nondisplaced_fracture/nondisplaced_fracture.html>>. Therefore, the bone does not lose its natural shape as a result of such fracture. See id.

swollen . . . . [On the same day, that is,] on 11–19–10[, apparently after returning from his visit with Dr. Sattel,] Plaintiff gave Nurse Roxxana another medical slip [stating that he was dissatisfied with Dr. Sattel's determination and requesting] a second opinion. [The next day, that is,] on 11–20–10[,] Plaintiff [deposited yet] another medical slip [again] requesting to see a different doctor.  [The next day, that is,] on 11–21-10[,] Plaintiff spoke to Nurse Nicole who [verified that] Plaintiff would be placed on appointment sheet to see [another] doctor. [Yet, on the next day, that is,] on 11–22–10[,] Plaintiff put in another medical slip asking for MRI of [his] finger. . . . [Forty-eight hours later, that is,] on 11–24–11[,] Plaintiff [was seen by another] doctor . . . who ordered a new x-ray. [Apparently, that x-ray was taken and processed within the next eight days, since] on 12–3–10[,] Plaintiff spoke with [an unspecified] member [of the M]edical [D]epartment . . . and was told [that his] knuckle [was] also broken and [so Plaintiff] need[ed] to see [a] specialist [about that new issue]. Plaintiff [then] put in medical slip to see specialist and also put in slip [requesting his] medical records. [Within forty-eight hours, that is,] on 12–5–10, Plaintiff [was seen by a] doctor . . . who stated [that] he wants a splint kept on [the injured] finger. [Four days later, that is,] on 12–9–10[, Plaintiff's finger and, seemingly, the knuckle area, were placed in splint.  Three weeks later, that is,] on 12–30–10[,] Plaintiff was examined by Ronald S. Glick, M.D. who [concluded], "Physical examination of the left fifth finger shows fusiform swelling with tenderness to the PIP Joint and middle phalanx. . . .  The patient was unable to make a full fist.  Review of x–rays of the left hand on 12–21–10 showed a healed oblique fracture of the proximal half of the middle phalanx with extension into the articular surface.  On the lateral view, there is a very subtle stepoff of the articular itself.   IMPRESSION:  Healed . . . fracture of . . . left fifth finger. RECOMMENDTIONS: 1. Unfortunately, there is a little to do for this fracture formally at this time since it has healed. . . . [There is a] probability of long term residual swelling and decreased motion."

Id. at 2-6.

Plaintiff's allegations regarding the medical treatment of the alleged injury to his finger can be subdivided into two periods: (a) from October 12, 2010, to November 8, 2010, inclusive ("Period I"); and (b) from November 9, 2010, to December 30, 2010, inclusive ("Period II"). The allegations provided in Plaintiff's amended complaint as to Period II indicate that he was given constant medical attention on virtually a daily basis, sometimes a few times a day. See Docket Entry No. 6, at 3-6. Indeed, his allegations verify that he was seen by a member of medical personnel on the first day of Period II, that is, the very day when he submitted his requests for medical attention and, from that point on, he was seen by a specialized doctor or a general doctor, or a nurse almost every day (or every second day or, at the latest, within three-four days), and was provided with continuous, various forms of medical treatment. See id. While Plaintiff expresses displeasure with such facts as the one that the processing of his x-ray was not immediate, or that he was initially seen by nurses rather than by doctors, or that he was seen by specialized doctors after being seen by general practitioners, or that the doctors differed in their conclusions as to the finesse of his medical diagnosis, not a single statement made by Plaintiff with regard to Period II suggests, even vaguely, deliberate indifference on the part of Defendants. While, hypothetically, Plaintiff's challenges raised

with regard to his treatment administered during Period II might provide bases for negligence-based medical malpractice claims within the meaning of the state tort law, these challenges facially fail to assert a wrong of constitutional magnitude, since "deliberate indifference" is more than mere malpractice or negligence: it is a state of mind equivalent to reckless disregard of a known risk of harm. See Farmer v. Brennan, 511 U.S. 825, 837-38 (1994). As this Court already explained to Plaintiff, a prisoner's subjective dissatisfaction with his medical care cannot indicate deliberate indifference, see Andrews v. Camden County, 95 F. Supp.2d 217, 228 (D.N.J. 2000); Peterson v. Davis, 551 F. Supp. 137, 145 (D. Md. 1982), aff'd, 729 F.2d 1453 (4th Cir. 1984), just as "mere disagreements over medical judgment do not state Eighth Amendment claims," White v. Napoleon, 897 F.2d at 110 (3d Cir. 1990), because "[c]ourts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment. Implicit in this deference to prison medical authorities is the assumption that such informed judgment has, in fact, been made." Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and citation omitted). In other words, even if the judgment of specialized or general doctors, or nurses as to the proper course of Plaintiff's treatment is ultimately shown to be wrong, such wrongfulness would establish

only a tort of medical malpractice, not an Eighth Amendment violation. See Estelle, 429 U.S. at 105-06; White, 897 F.2d at 110. Therefore, Plaintiff's claims based on his medical care administered during Period II are subject to dismissal. Since Plaintiff's amended complaint detailed the events of Period II on daily and, occasionally, on hourly bases, it is apparent that Plaintiff stated all the facts known to him with regard to Period II. Therefore, granting Plaintiff another leave to amend his challenges as to Period II would necessarily be futile, and no such leave will issue.[2]

The Court now turns to Period I, which began on October 12, 2010, and lasted for four weeks, that is, until November 8, 2010,

---

[2] Ordinarily, the plaintiff may be granted "leave [to amend,] . . . when justice so requires." See Foman v. Davis, 371 U.S. 178, 182 (1962); Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993). Indeed, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." Foman, 371 U.S. at 182-83. However, "[a]llowing leave to amend where 'there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced, which would, if true, cure the defects in the pleadings . . . , would frustrate Congress's objective in enacting this statute of 'provid[ing] a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis."' Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp., 394 F.3d 126, 164 (3d Cir. 2004) (citation omitted). For instance, where the plaintiff had already amended plaintiffs complaint and yet failed to allege sufficient facts, the courts may find that "[the previous number of] bites at the apple is enough," and conclude that it is proper to deny leave to replead. Salinger v. Projectavision. Inc., 972 F. Supp. 222,236 (S.D.N.Y. 1997) (citing Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2 (2d Cir. 1996).

inclusive (since, on November 9, 2010, Plaintiff submitted another "medical slip" and was seen by a doctor on that very day, and then continued being seen by medical personnel on virtually daily basis during the entirety of Period II). With regard to Period I, Plaintiff asserts that:

- a. He injured his finger fighting with another inmate on the first day of Period I. On that day, he went to the Medical Department to obtain his regular medication and showed his finger to Nurse Roxxana who at no point denied him treatment; rather, Nurse Roxxana *recommended* Plaintiff to submit a "medical slip" requesting medical care, since Roxxana allegedly hypothesized that the finger might be "broken";
- b. In response to Roxxana's recommendation, Plaintiff submitted, on that very first day of Period I, *four* medical "medical slips": one to Nurse Roxxana, one to Nurse Susan, one to Nurse Adrianna and one to Sgt. Zoll;
- c. On an unspecified date during Period I, Plaintiff re-stated his interest in having his finger examined by a doctor to Lt. Laaf and Captain Lorkin; and
- d. On an unspecified date during Period I, Plaintiff showed his finger to Nurse Maurice (seemingly, at the time when Nurse Maurice was dispensing a certain medication to Plaintiff), in response to which Nurse Maurice stated

that the "swelling would go away."

Docket Entry No. 6, at 2.

The allegations stated against Nurses Roxxana, Susan, Adrianna, Lt. Laaf and Captain Lorkin fail to state a claim within the pleading requirements articulated in Iqbal: none of Plaintiff's statements plausibly suggests that these Defendants were deliberately indifferent to Plaintiff's medical needs: on the contrary, they encourage Plaintiff to seek medical attention and assist Plaintiff with his immediate needs.[3] Moreover, Plaintiff's day-by-day (and, on occasion, hour-by-hour) account of the alleged events at no point suggested, even remotely, that any of these Defendants either intentionally refused medical treatment to Plaintiff or took any action delaying his medical treatment for non-medical reason, or took measures to delay his medical diagnosis, or erected arbitrary or burdensome procedures barring Plaintiff from obtaining medical care. See id. Stripped of all niceties, Plaintiff's claims against these Defendants merely turn

---

[3] Plaintiff's original complaint indicated that Nurses Stacy and Adrianna provided Plaintiff with an ice pack in order to help him with the swelling of his finger; this Plaintiff's statement is assessed as pled fact for the purposes of this Court's instant analysis. See Jackson v. Broad. Music, Inc., 2006 U.S. Dist. LEXIS 3960, at *18 (S.D.N.Y. Jan. 31, 2006) ("the court may take judicial notice of . . . 'admissions in pleadings . . . filed by a party . . . that contradict the party's factual assertions in a subsequent [stage]'") (quoting Harris v. New York State Dep't of Health, 202 F. Supp. 2d 143, 173 (S.D.N.Y. 2002), and citing Munno v. Town of Orangetown, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005)), t

on the fact that Plaintiff's examination by a doctor took place four weeks after Plaintiff's alleged injury, but no statement in the amended complaint (or in the original complaint) stitches this four-week delay to any particular action by Nurses Roxxana, Susan, Adrianna, Lt. Laaf and Captain Lorkin.  Indeed, it appears equally possible that: (a) these Defendants were negligent in conveying Plaintiff's requests to the person in charge of scheduling appointments with medical personnel; or (b) each of the Nurses passed Plaintiff's simultaneously-filed "medical slips" to the person in charge of that scheduling, and Lt. Laaf and Captain Lorkin also conveyed Plaintiff's requests for medical care, but that sudden and simultaneous flurry of "medical slips" and requests for medical care resulted in a confusion and presumption that one such "medical slip" was already registered and all else were merely duplicates.[4]  Since Plaintiff's allegations against these Defendants assert a mere long-shot possibility at a claim and fail to enter the realm of plausibility, his challenges against these Defendants are subject to dismissal.  "[T]he plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully.  [Indeed, even w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, [the

---

[4] Moreover, both these possibilities are indicative merely of negligence rather than of reckless disregard, and even that hypothetical negligence cannot be linked to Nurses Roxxana, Susan, Adrianna, Lt. Laaf and Captain Lorkin.

so-alleging complaint still] 'stops short of [showing] plausibility of 'entitlement to relief.'" Iqbal, 129 S. Ct. at 1949-54 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556-57 (2007)). Since Plaintiff's amended complaint provides careful account of all events relevant to the actions of Nurses Roxxana, Susan, Adrianna, Lt. Laaf and Captain Lorkin during Period I, the Court has no basis to presume that Plaintiff might state facts indicative of these Defendants' reckless disregard of Plaintiff's medical needs. Thus, Plaintiff's claims against these Defendants are subject to dismissal and no leave to amend his claims against these Defendants shall issue.

In light of the foregoing, the sole remaining claim articulated in Plaintiff's amended complaint is one of Plaintiff's claim made against Nurse Maurice; that claim turns on Plaintiff's allegation that Nurse Maurice, upon seeing Plaintiff's swollen finger, concluded that Plaintiff was not in need of medical care (because of Maurice's conclusion that the "swelling would go away"). On one hand, the statement allegedly made by Maurice reads like a medical diagnosis, i.e., as a statement that Plaintiff's alleged injury was such that the only medical treatment required was time. If so, Plaintiff's claims against Maurice are subject to dismissal since, even if Maurice's diagnosis was erroneous, Plaintiff's allegations based on that diagnosis assert nothing but a negligence-based medical malpractice challenge rather than a

claim of constitutional magnitude.  See  Farmer v. Brennan, 511 U.S. at 837-38.  However, recognizing that Nurse Maurice's statement could have been made in a factual context indicative of Nurse Maurice's outright refusal to provide any form of medical care (rather than a merely erroneous diagnosis), the Court finds it warranted to allow Plaintiff one more opportunity to elaborate, in detail, on the events of – as well as the exact date (if known), the circumstances and other statements uttered in the process of – Plaintiff's medical visit with Nurse Maurice during which Nurse Maurice allegedly stated that Plaintiff needed no medical treatment and the "swelling would go away."  Therefore, a limited leave to amend will issue as to *this narrow line* of Plaintiff's challenges.[5]

Finally, the Court takes notice of Plaintiff's intermittent line of challenges asserting that the prison officials did not sufficiently investigate his grievances or failed to reply to his grievances (or that they replied in a fashion that Plaintiff found unsatisfactory).  To the extent these challenges seek to assert denial of medical care, they are identical to those assessed by this Court under the Eighth Amendment.  To the extent these challenges are striving to allege that Plaintiff's rights were violated by not getting a response (or by getting a response other

---

[5] The Court notes that Plaintiff's other challenges against Nurse Maurice, pertaining to Period II, are not included in the limited leave to amend since Plaintiff was provided with constant medical care during that Period.

than the one Plaintiff desired), these challenges are subject to dismissal as facially invalid. Indeed, it is well established that "[p]risoners are not constitutionally entitled to a grievance procedure and the state creation of such a procedure does not create any federal constitutional rights," <u>Wilson v. Horn</u>, 971 F. Supp. 943, 947 (E.D. Pa. 1997), and a failure to respond to an inmate's grievances "does not violate his rights to due process and is not actionable." <u>Stringer v. Bureau of Prisons</u>, 145 Fed. App'x 751, 753 (3d Cir. 2005) (citing <u>Antonelli v. Sheahan</u>, 81 F.3d 1422, 1430 (7th Cir. 1996)). Since this line of Plaintiff's challenges, if intended to assert a violation of his rights either by failure to respond to his grievances or by an insufficient response to his grievances, is facially without merit, issuance of leave to amend these challenges would necessarily be futile. Therefore, no leave to amend will issue as to these claims.

For the foregoing reasons, Plaintiff's first amended complaint, Docket Entry No. 6, will be dismissed. All Plaintiff's challenges except for his allegation that Nurse Maurice found that no medical care for Plaintiff's alleged injury was needed because the "swelling would go away" will be dismissed with prejudice, for failure to state a claim upon which relief can be granted. Plaintiff's allegations that Nurse Maurice found that no medical care for Plaintiff's alleged injury was needed because the "swelling would go away" will be dismissed without prejudice, and

Plaintiff will be granted leave to submit his second amended complaint detailing his allegations as to this particular set of events.  Plaintiff's renewed motion for appointment of <u>pro</u> <u>bono</u> counsel, Docket Entry No. 7, will be dismissed without prejudice, as premature.  An appropriate Order accompanies this Memorandum Opinion.

<u>s/Renée Marie Bumb</u><br>
**RENÉE MARIE BUMB,**<br>
**United States District Judge**

Dated: <u>March 2, 2012</u>